GEORGE S. BILLINGS, as Receiver of the HUDSON RIVER STONE SUPPLY COMPANY, Respondent, *v.* JAMES G. SHAW et al., Appellants, Impleaded with Others.

Corporations — duties and obligations of directors and officers of stock corporations — validity of corporate acts of such directors and officers — when such acts invalid for a breach of fiduciary relation of such directors and officers to stockholders — sale of corporate property and secret division of profits thereof among some of the directors and officers of a corporation. .

1. Directors of corporations act in a fiduciary capacity. In every action where the interest of the corporation is involved, particularly where the same is in conflict with the individual interest of the directors, they act as trustees and are strictly accountable to the creditors or stockholders of the corporation for their action. The relation of an officer of a corporation to it is such as that he must at all times act in good faith and unselfishly toward the corporation.

2. The illegality of a profit made by a director arises almost wholly by reason of some undisclosed and secret bias on his part against the interest of the corporation of which he is a director. If a profit is made in a transaction that is honest in itself, and is open and aboveboard, and the transaction is consummated after an honest statement of the facts to the board of directors at a meeting, and to the stockholders at a stockholders' meeting, there is no reason for criticism or for charging such director with any profits that he may make.

3. The president, directors and paid officers of a corporation cannot, in the performance of the official duties which they owed exclusively to the corporation, dispose of the company's property and distribute the proceeds thereof according to the provisions of an agreement kept secret from the other directors and stockholders, and thus realize a profit to any of themselves out of such proceeds. Such directors and officers sustain a fiduciary relation to the corporation and its stockholders and have no right to take to their own use claims on notes and open accounts against the company, which claims came into their hands while they were winding up its affairs, they having given no consideration therefor except their official services in selling the company's property and paying the company's debts. Directors,, who so acted, ignored their duty and acted for their individual interests, hence they obtained no beneficial interest or equitable right in the property so obtained, and must account therefor for the benefit of the stockholders.

*Billings* v. *Shaw*, 151 App. Div. 888, affirmed.

(Argued June 18, 1913; decided October 21, 1913.)

APPEAL from a final judgment, entered December 10, 1912, after affirmance by the Appellate Division of the Supreme Court in the second judicial department of an interlocutory judgment of Special Term in favor of plaintiff.

The nature of the action and the facts, so far as material, are stated in the opinion.

*Charles F. Brown, Harmon S. Graves, Henry de Forest Baldwin, Robert M. Miles* and *Charles S. Yawger* for appellants. A director may purchase the obligations of his corporation, matured or unmatured, for less than par and enforce them against the corporation for their full amount when there is no conflict of interest between him and the corporation with respect to the transaction. (Morawetz on Corp. § 521; *Parker* v. *Nickerson*, 137 Mass. 488; *Ingelhart* v. *T. I. Hotel Co.*, 32 Hun, 377; 109 N. Y. 454; *Gamble* v. *Q. C. Water Co.*, 123 N. Y. 91; *Seymour* v. *S. F. C. Assn.*, 144 N. Y. 339; *Camden* v. *Citizens*, 69 N. J. Eq. 708; *Stanton* v. *Gil-*

*pin,* 38 Wash. 191; *McIntyre* v. *Adjax Co.,* 28 Utah, 162; *Hughes* v. *Lansing,* 154 Ill. 301; *Powell* v. *W. V. Co.,* 15 Oreg. 393; *Buckley* v. *Whitcomb,* 121 N. Y. 107.) There was no conflict of interest between Shaw and Chamberlin on the one side and the corporation on the other. (*Inglehart* v. *T. I. Hotel Co.,* 109 N. Y. 466.) The stock transferred to Shaw and Chamberlin by St. John as executor has been finally adjudicated to be their property. As holders of two-thirds of the stock they can vote it to establish the corporation's honest debts. (*Gamble* v. *Q. C. Water Co.,* 123 N. Y. 91; *Little* v. *Garabrandt,* 90 Hun, 404; *Bostock* v. *Young,* 118 App. Div. 490; *H. Nat. Bank* v. *A. D. & T. Co.,* 148 N. Y. 612; *Skinner* v. *Smith,* 134 N. Y. 240; *Kent* v. *Q. M. Co.,* 78 N. Y. 159; *S. H. B. Co.* v. *Eickemeyer,* 90 N. Y. 607; *Dickinson* v. *Black,* 116 App. Div. 545; *Mechanics & T. Bank* v. *Hazard,* 30 N. Y. 226; *Continental Bank* v. *Nat. Bank,* 50 N. Y. 575.) If the company is to take the notes and open account and the proceeds thereof, it must return to Shaw and Chamberlin what they gave for them or the fair value thereof. (Morawetz on Corp. [2d ed.] § 526; *Gamble* v. *Q. C. Water Co.,* 123 N. Y. 91; *Seymour* v. *S. F. C. Assn.,* 144 N. Y. 333; *Davoue* v. *Fanning,* 2 Johns. Ch. 252; *Fox* v. *Mackreth,* 1 White & Tudor's L. C. 115, 173; *Ex parte Reynolds,* 5 Ves. 707; *Duncomb* v. *N. Y., H. & N. R. R. Co.,* 84 N. Y. 190; *Gardner* v. *Butler,* 30 N. J. Eq. 702.)

*William H. Good, Josiah T. Marean* and *Alexander Campbell* for respondent. The duty of Shaw and Chamberlin as directors and officers of the Hudson River Stone Supply Company, on and prior to September 30, 1901, was in direct conflict with the alleged services which they say they rendered to the executor of Wallace C. Andrews. The services which they say they rendered were exclusively services which they were in duty bound to render to the defendant company. There was no

"purchase." The only money used was the company's money. (*Lightfoot* v. *Davis*, 198 N. Y. 261; *People ex rel. Manice* v. *Powell*, 201 N. Y. 194; Morawetz on Corp. § 517; *Jacobson* v. *B. L. Co.*, 184 N. Y. 162; *Carpenter* v. *Taylor*, 164 N. Y. 171; *Munson* v. *S., G. & C. R. R. Co.*, 103 N. Y. 58; *McClure* v. *Law*, 161 N. Y. 78; *F. & M. Bank* v. *Downey*, 53 Cal. 466; *Electric Light Co.* v. *Bates*, 68 Vt. 584; *Sheridan* v. *Elec. Light Co.*, 38 Hun, 402; *Cumberland Coal Co.* v. *Sherman*, 16 Md. 456.) The Hudson River Stone Supply Company was a separate entity from Wallace C. Andrews and from his executor; the fact that the Andrews estate was a dominant creditor and a large stockholder did not make the Andrews estate the same entity as the corporation nor give the Andrews estate a right to disregard minority stockholders. (*B. L., T. & S. D. Co.* v. *M. G. & E. L. Co.*, 162 N. Y. 67; *S. & L. P. R. R. Co.* v. *Arnold*, 167 N. Y. 368; *Stone* v. *C., C., C. & S. L. Ry. Co.*, 202 N. Y. 352.)

Chase, J. · The contention of the appellants is that the conclusions of law on which the interlocutory and final judgments are based are not supported by the findings of fact.

By the findings it appears that the Hudson River Stone Supply Company, a domestic corporation, was organized March 12, 1890, with a capital of $300,000 for the purpose of quarrying and crushing stone and selling the same. It was formed to combine as one plant property owned by one Wallace C. Andrews and property owned by the Hudson River Broken Stone and Supply Company, all the stock of which was owned and controlled by one Dady and one Payne. Two-thirds of the stock of the new corporation was issued to Andrews for his property, and one-third thereof in equal shares to Dady and Payne respectively, for the property of the Hudson River Broken Stone and Supply Company. Andrews

became the president of the corporation and remained its president until his death which occurred April 7, 1899. The new corporation executed its bonds to the amount of $300,000 which were secured by mortgage on its property. The said Andrews at the time of his death was the owner of the two-thirds of the stock of the corporation excepting a few shares issued to persons to qualify them as directors. He also owned all of said bonds with the coupons attached for unpaid interest amounting to over $100,000. He also held the promissory notes of the corporation amounting to $612,851.52 besides interest, and there was due to him from said corporation an open account amounting to more than $42,000. All the stockholders of the corporation were officers or directors thereof.

Andrews left a will which was duly probated in which he named Gamaliel C. St. John his executor, and he duly qualified as such. He became the president of the corporation soon after his appointment as such executor. The defendant James G. Shaw in the year 1897 became an assistant to the president and the general manager of the corporation; he was one of its directors and its vice-president from February 24, 1898, and a member of the executive committee from March 5, 1900. During all the time when he was engaged in the negotiations herein mentioned he was receiving a salary of $5,000 a year from the stone supply company for his services as an officer thereof.

The defendant Edward K. Chamberlin was an employee, a director, and one of the executive committee of said corporation for more than a year prior to September 30, 1901. The executive committee of the corporation from March 5, 1900, until after September 30, 1901, consisted of St. John, Shaw and Chamberlin. After St. John was elected president of the corporation, and prior to January 12, 1901, he requested said Shaw to find a purchaser for the plant of the Hudson River Stone Supply Company or

the bonds, notes, open accounts and stock held by the estate of said Andrews therein. On the day last mentioned, for the purpose of enabling him to negotiate the sale of said plant and holdings, he gave to Shaw a letter of which the following is a copy:

"THE NEW YORK STEAM COMPANY,
"*January* 12, 1901.
"My dear Mr. SHAW:

"I beg leave to submit to you the following propositions for the Andrews holdings in the Hudson River Stone Supply Company, as well as the boats belonging to the same estate, which are in the service of said Company; said propositions also including the three boats belonging to myself, who are also at the present time in the service of the said Company:

1st proposition

| | |
|---|---:|
| Plant.......... | $300,000.00 |
| Andrews' boats. | 75,000.00 |
| St John boats... | 15,000.00 |
| Money in bank. | 36,000.00 |

426,000.00 for Andrews holdings and
St John boats

2nd proposition

| | |
|---|---:|
| Check to estate from said Stone Co. before sale is made....... | 36,000.00 money in bank |
| Plant.......... | 300,000.00 |
| Andrews' boats. | 75,000.00 |
| St Johns boats. | 15,000.00 |

390,000.00 for Andrews holdings and
St John boats

"Very truly yours
"G. C. ST JOHN as executor,
"G. C. ST JOHN."

A few days thereafter, at the request of Shaw, St. John gave him a paper signed by him as follows:

"Know all men by these presents, that I, Gamaliel C. St John as executor of the last will and testament of Wallace C. Andrews deceased, in consideration of the sum of one dollar to me in hand paid the receipt whereof is hereby acknowledged do hereby give and grant unto E. K. Chamberlin and James G. Shaw the privileges and option to purchase from me all the right title and interest of the said estate and of me as such executor in and to the Hudson River Stone Supply Company, to wit: $200,000 par value of its capital stock $300,000 par value of its bonds together with the unpaid coupons belonging thereto $612,851.52 principal in notes of the said company, together with any indebtedness of the said company on open account to the said estate, or me as such executor, for the sum of $332,250 in cash also fifteen (15) scows or boats belonging to the said estate, for the sum of $75,000 in cash and also three (3) boats belonging to me said Gamaliel C. St John individually for the sum of $15,000 cash.

"This option shall terminate and be of no effect unless the same shall have been accepted in writing by the said Chamberlin and the said Shaw prior to the expiration of sixty days from the date hereof, and is to be accepted or rejected as a whole.

"In witness whereof I have subscribed my hand this 21st. day of January 1901.

"Estate of W. C. ANDREWS,
"by G. C. ST JOHN, executor."

Such option was renewed from time to time in writing. The last renewal expired September 19, 1901. Shaw made an effort to procure some person to purchase the plant of said corporation or the holdings of said Andrews therein. A meeting of the directors of said company was held April 9, 1901, at which a majority of the board of

directors, including St. John, Shaw and Chamberlin, were present, but not including said Dady and Payne, and passed resolutions of which the following is a copy:

" *Resolved* that this Company sell its property at Clinton Point including land, buildings and machinery and that the President or Vice President and Secretary be and are hereby authorized to execute and deliver to the purchaser a good and sufficient deed or deeds of the same conveying the fee simple free from mortgage upon receiving the sum or price of $310,000.

" *Resolved* that upon the receipt of the sum of $310,000 for the property of this Company at Clinton Point the Treasurer is directed to pay the same at once over to G. C. St John, executor of W. C. Andrews deceased upon his turning over to the purchaser the bonds and coupons of this company held by him to the end that the property may be freed from the mortgage securing said bonds as provided in the deed from this Company to the purchaser.'

On the 16th day of September, 1901, before said option had expired, the negotiations resulted in a statement by one Upham A. Andrews and his associates that they would take the plant of the company at Clinton Point at $310,000, and pay $90,000 in addition for the scows owned by the estate of Andrews and by St. John individually, making a total payment for plant and scows of $400,000. The offer was reported to St. John.

Another corporation was organized of which Shaw became a director and the general manager, and on September 30, 1901, the plant of the corporation at Clinton Point, its quarry and property, machinery and personal property used in its business, being its sole tangible assets excepting money in bank, book accounts and notes receivable and an unimportant, unworked and valueless small parcel of unimproved land at Montrose and a few trifling articles of personal property were transferred to the new corporation. The stone supply company received therefor $310,000 and the Andrews estate and St. John indi-

vidually received for their individual interests in scows $75,000 and $15,000 respectively. The check of $310,000 was indorsed over to the estate of Andrews in payment of the bonded indebtedness and interest. There was also paid to St. John as executor $22,250 and individually for balance salary as president of the stone supply company $3,750, all the payments aggregating $426,000, the amount mentioned in St. John's letter to Shaw above quoted. The check of $22,250 was credited on the books of the corporation and charged to the estate of Andrews on its open account. The new corporation entered into possession of the property and St. John as such executor assigned, transferred and delivered to Shaw and Chamberlin 2,000 shares of stock (including the shares held by the stockholders other than Dady and Payne) held by the estate of Andrews in said corporation, and also all obligations which said estate held in promissory notes and open account against said corporation, and he thereupon resigned all offices held by him in said corporation. Thereafter Shaw and Chamberlin claimed said notes and open account as their individual property. Shaw continued to act as the vice-president of the stone supply company.

It is found that there was no consideration moving from the said defendants Shaw or Chamberlin or either of them to St. John as executor of the estate of Andrews, deceased, for said assignment of said notes and open account, except the consideration of the services which said Shaw and Chamberlin rendered in the sale of the corporation property above enumerated and the payment of its indebtedness.

On October 1, 1901, the day after the transfer of said notes and account to said Shaw and Chamberlin, they received from the stone supply company by check countersigned by Shaw as vice-president $15,000 which they credited upon the open account. Thereafter and before the commencement of this action they received by checks

countersigned by Shaw as vice-president and by transfer of property from said company amounts, including said $15,000, aggregating $73,358.30, which were credited on said open account and notes of the corporation.

This action is brought by the receiver of the stone supply company to recover of the defendants the amount so received by them individually. There are no creditors of said corporation and the recovery herein is for the ultimate benefit of the stockholders, including Dady and Payne. It is found that said Dady and Payne did not consent to the passage of the resolutions mentioned, and that payments and application of the assets of said company was without the knowledge and consent of said Dady and Payne and had not been approved, confirmed or ratified by them in any way and said Dady and Payne did not know that there was an agreement between said St. John and Shaw and Chamberlin by which Shaw and Chamberlin were to profit personally by the sale of the plant and property of the stone supply company.

Upon the findings of fact the court found as conclusions of law, among others, the following:

" 1. The two thousand shares of stock of the Hudson River Stone Supply Company became the property of said Shaw and Chamberlin by the transfer to them by St. John as executor and said two thousand shares of stock are the property of said Shaw and Chamberlin free and clear of any claim of the Hudson River Stone Supply Company or any stockholder thereof, or the plaintiff herein.

" V. The said Shaw and Chamberlin received the legal title to said notes and open account by the transfer from said St. John as executor, but not the beneficial interest or equitable right."

The court also found as conclusions of law at the request of the plaintiff, among others, the following:

" *First.* That the assignment made by Gamaliel C. St. John as executor of the last will and testament of

Wallace C. Andrews, deceased, to the defendants James G. Shaw and Edward H. Chamberlin, dated the 30th day of September, 1901, and the transfer and delivery thereof, together with the said notes and book accounts to the said defendants, was ineffectual to convey to the said defendants James G. Shaw and Edward K. Chamberlin, or either of them, any equitable right, title or interest in and to the notes made by the said Hudson River Stone Supply Company to Wallace C. Andrews or to the book accounts held by the estate of Wallace C. Andrews against said company.

"*Second.* That upon the execution of the said assignment dated the 30th day of September, 1901, and the delivery of the same together with said notes and book accounts, to the said defendants James G. Shaw and Edward K. Chamberlin, the beneficial and equitable title to said notes and book accounts became vested in the Hudson River Stone Supply Company and the said defendants James G. Shaw and Edward K. Chamberlin received the same as trustees for the benefit of said Hudson River Stone Supply Company and its stockholders.

"*Fifth.* That the withdrawal of the moneys of the Hudson River Stone Supply Company from its bank account by the said defendants James G. Shaw and Edward K. Chamberlin and the payment thereof on account of the said notes and book accounts so received and so in their possession was an unlawful appropriation of the moneys and property of the Hudson River Stone Supply Company to their use and a violation of their trust duties as trustees and officers of the said Hudson River Stone Supply Company.

"*Eighth.* That the transfer and acceptance by the said defendants James G. Shaw and Edward K. Chamberlin of the promissory notes owned by the said Hudson River Stone Supply Company and the application of the same by them upon account of the promissory notes and open book accounts in their possession and mentioned and

referred to in said assignment dated the 30th day of September, 1901, was an unlawful appropriation by said defendants of the property and assets of the Hudson River Stone Supply Company to the use of said defendants and a violation of their trust duties as trustees and officers of said Hudson River Stone Supply Company.

" *Twelfth.* That the services rendered by Shaw and Chamberlin in bringing about and procuring the sale of the plant of the Hudson River Stone Supply Company as aforesaid and completing said sale, executing the said deed, receiving the said money and discharging the various items of indebtedness of said Hudson River Stone Supply Company both to the estate of Wallace C. Andrews and to other persons, were services which were within the scope of the duties of the said James G. Shaw as officer and trustee of said company as aforesaid and within the scope of the duties of the said E. K. Chamberlin as trustee and officer of said company as aforesaid and that all the services so performed by said Shaw and Chamberlin in and about the sale and conveyance of said company's plant and as herein set forth were the duties devolved upon them as directors and officers of the Hudson River Stone Supply Company.

" *Fourteenth.* That the defendants James G. Shaw and Edward K. Chamberlin are accountable to the plaintiff for all moneys and open accounts and promissory notes due to the said Hudson River Stone Supply Company which said defendants collected, received and applied to their own use upon the said promissory notes made by the company and the open book accounts due by the company so taken under said assignment dated the 30th day of September, 1901, or otherwise taking said notes at their face value.

" *Seventeenth.* That said defendants James G. Shaw and Edward K. Chamberlin should be credited with their necessary and actual disbursements now remaining unpaid in the collection of the moneys due to the said

Hudson River Stone Supply Company which collections were made since the 30th day of September, 1901."

By the judgment appealed from the transfer to the defendants of the stock held by St. John as executor in the stone supply company has been upheld. The judgment provides that the defendants because of their ownership of said stock retain two-thirds of the net assets of the stone supply company so collected by them. Whether that part of the judgment upholding the transfer to the defendants of said stock is considered as made in compensation for selling the scows of St. John as executor and individually or (inconsistent though the judgment in all its parts may be if so considered) as sustaining in part the claim of the defendants for general services in procuring a purchaser for the stone supply company plant and scows, it is now in that respect unassailable by the plaintiff as he has not appealed therefrom and the defendants accept it as a partial victory for them. It is, however, urged that the amount to be retained by the defendants by reason of such transfer of stock is a very large sum, and that its retention materially affects the equities of the case so far as the defendants are concerned.

For the purpose of determining the duties of the defendants as directors of the stone supply company, a recapitulation and further statement of the facts as they existed September 30, 1901, and for some time prior thereto, will be helpful. During all such time the indebtedness held by Andrews and after his death by his estate against the stone supply company was more than the company could pay. The insolvency of the company was recognized by every one connected therewith prior to the death of Andrews. The directors of the company prior to the death of Andrews authorized him and Shaw to act as a committee to negotiate an option with a person named for the purchase of all of the plant, property and business of the corporation and the scows of Andrews individually at such price as they might deem best to

insert therein. The resolution of the directors was never acted upon, but a few days later an option was actually given to another person, by which the corporation agreed to sell all of its property and business to such person for $750,000. Such option was never exercised. After Andrews' death, St. John as president of the corporation and as executor of the estate of Andrews was anxious to dispose of the interest of the estate therein and to sever his connection with the corporation. As we have seen, on January 12, 1901, he authorized Shaw to dispose of the Andrews holdings in the stone supply company for $336,000, and in substance suggested that it could be paid to the extent of $36,000 in cash from the treasury and by $300,000 which is designated by him as "plant." The stone supply company had $36,000 and more of cash at that time. It is quite clear that it was the intention of St. John, acquiesced in by Shaw, to raise the $300,000 in cash by a loan upon or a sale of the plant. Shaw, who must be considered in connection with the fact that he was a director and the general manager of the corporation, knew that the large indebtedness of the corporation held by the estate of Andrews, both secured and unsecured, was for sale at an enormous discount. A few days thereafter the formal option quoted was given to Shaw and the defendant Chamberlin, in which the holdings of the Andrews estate specifically mentioned were offered for $332,250 in cash. The difference between the amount mentioned in the formal option and in the letters to Shaw is $3,750, which it appears was an amount which it was necessary to pay to St. John individually in connection with the transaction as compensation for his services as president of the corporation.

The situation presented in this case is not one where the obligations of a corporation payable at a future time were purchased when offered in the open market and in the ordinary course of business and at a time when the corporation was not seeking to pay its indebtedness or

purchase the same at a discount or to go into liquidation. The findings show that the stone supply company owed an enormous indebtedness, all of which was due. Such indebtedness was owned by an estate which was in no position to further advance the interests of the corporation, and the executor thereof desired to dispose of his holdings and was offering the same at a price which it was possible, as it now appears, for the corporation to pay in cash from its treasury and a sale of its plant.

St. John as the president of the corporation and as the executor of the Andrews estate occupied a dual position, and in each relation knew all the facts affecting the transactions disclosed by the record herein. Shaw as general manager was receiving a large salary for his services, and, so far as appears, such salary was intended as compensation for his whole time.

The duty of a director under the circumstances disclosed was first to the corporation and its stockholders in an effort to subserve its and their interest. St. John's duty, particularly in view of his dual relation as well as the duty of Shaw and Chamberlin, was to act with the greatest publicity toward the corporation as an existing entity and to the stockholders thereof. The relation of an officer of a corporation to it is fiduciary, and he must at all times act in good faith and unselfishly toward the corporation. (*Jacobson* v. *Brooklyn Lumber Co.*, 184 N. Y. 152, 162.) Unselfish regard for the corporation required that the directors should make known to it and to those directly interested in it the opportunity that had arisen through the offer of St. John to free the corporation of an existing indebtedness by the payment of a comparatively small sum in view of the aggregate corporate indebtedness.

So far as appears the true arrangement between St. John and Shaw and Chamberlin was never disclosed to the corporation nor to the stockholders as such. Knowledge by St John as an individual, under the circumstances disclosed, was not such knowledge by the corporation that

it can be charged with acquiescence in what now appears to have been a secret agreement. The illegality of a profit made by a director arises almost wholly by reason of some undisclosed and secret bias on his part against the interest of the corporation of which he is a director. If a profit is made in a transaction that is honest in itself, and is open and fully disclosed, and the transaction is consummated after an honest statement of the facts to the board of directors at a meeting, and to the stockholders at a stockholders' meeting, there is no reason for criticism or for charging such director with any profits that he may make. (Thompson on Corporations [2d ed.], sec. 1237.) In this case no opportunity was given to the corporation to become the purchaser, directly or indirectly of the Andrews holdings of its obligations at a discount. A purchaser thereof was never found. The efforts of Shaw and Chamberlin resulted in a sale by the corporation of a part of its corporate property.

When the transaction was closed on September 30, 1901, St. John apparently in the interest of Shaw and Chamberlin, but certainly not in the interest of the corporation, gave to them another option and dated the same back to the 21st of January, 1901, by which he gave to them the right to purchase the bonds of the corporation with the unpaid interest thereon and include therewith the notes and open account of the corporation for $310,000. Such option provided that it should continue until the 21st day of October, 1901. It included therewith a further option to purchase the scows of St. John as executor for $75,000, and the scows of St. John individually for $15,000, and the further provision that it should be accepted or rejected as a whole.

Although at a meeting of the directors in April, 1901, a resolution was passed authorizing the president or vice-president and secretary to execute and deliver to a purchaser a good and sufficient deed or deeds of conveyance of the fee simple of the lands, buildings and

machinery at Clinton Point free from mortgage for $310,000, it does not appear that there was a disclosure at the meeting that on the further payment in cash of $22,250 to be made as a part of the transaction it was agreed between St. John and Shaw and Chamberlin, a majority of the directors then present, that the notes and open account were to be transferred to Shaw and Chamberlin individually. So far as appears from the resolution as adopted and in view of the letter and option quoted the payment in cash amounting, apart from the salary of St. John as president to $22,250, was in consideration of the transfer of the notes and account. The transfer should have been made to the corporation or in its interest or the obligations of the corporation should have been canceled instead of having the same transferred to Shaw and Chamberlin as individuals in direct violation of their duty as directors of the corporation. The payment by the corporation to St. John as executor of $22,250 was to make up the amount for which he was willing to relinquish *all the obligations* of the corporation held by the estate. As carried out, only the bonded indebtedness of the corporation was canceled. The $22,250 was not paid by Shaw and Chamberlin, but directly by the corporation. There was no resolution of the corporation or of its stockholders assenting to the payment of $22,250 on account or on account in connection with a further agreement in the defendant's interest that the notes and balance of open account be transferred to them.

Shaw and Chamberlin upon the most favorable consideration of the facts in their interest never gave anything for the transfer to them unless their time is treated as the consideration, and their time had already been sold to the corporation, or at least the time which was given to perfect a sale of the property was so given while they were generally employed as officers of the corporation whose property was being sold and whose assets and liabilities were the subject-matter under consideration.

An examination in detail of the many authorities cited by the parties to this appeal would not materially aid in the determination thereof because the decisions so cited are each dependent upon the particular facts of the cases under consideration.

Directors of corporations act in a fiduciary capacity. In every action where the interest of the corporation is involved, particularly where the same is in conflict with the individual interest of the directors, they act as trustees and are strictly accountable to the creditors or stockholders of the corporation for their action. (*Duncomb* v. *N. Y., H. & N. R. R. Co.*, 84 N. Y. 190, 198; *Hoyle* v. *Platts-burgh & Montreal R. R. Co.*, 54 N. Y. 314, 328; *Bulkley* v. *Whitcomb*, 121 N. Y. 1, 7; *People ex rel. Manice* v. *Powell*, 201 N. Y. 194, 200; *Jacobson* v. *Brooklyn Lumber Co.*, *supra*; Thompson on Corporations [2d ed.], secs. 1215, 1216, 1220.) It was stated by this court in substance in *Munson* v. *Syracuse, Geneva & Corning R. R. Co.* (103 N. Y. 58) that all acts of a director in his own behalf when his personal interest is in conflict with that of the corporation are invalid at the election of the corporation. The court say (p. 74): "The law permits no one to act in such inconsistent relations. It does not stop to inquire whether the contract or transaction was fair or unfair. It stops the inquiry when the relation is disclosed, and sets aside the transaction or refuses to enforce it, at the instance of the party whom the fiduciary undertook to represent, without undertaking to deal with the question of abstract justice in the particular case. It prevents frauds by making them, as far as may be impossible, knowing that real motives often elude the most searching inquiry, and it leaves neither to judge nor jury the right to determine upon a consideration of its advantages or disadvantages, whether a contract made under such circumstances shall stand or fall. * * * The value of the rule. of equity, to which we have adverted, lies to a great extent in its stubbornness and inflexibility. Its rigidity gives it one

of its chief uses as a preventive or discouraging influence, because it weakens the temptation to dishonesty or unfair dealing on the part of trustees, by vitiating without attempt at discrimination, all transactions in which they assume the dual character of principal and representative."

On the facts enumerated the court found that the defendants were liable to account to the corporation, and, as we have already stated, that "Shaw and Chamberlin received the legal title to said notes and open account by the transfer from said St. John as executor, *but not the beneficial interest or equitable right.*"

The defendants ignored their duties as directors of the stone supply company and acted in their individual behalf. Such is the result of the findings and conclusions of the trial court sustained by the Appellate Division, and we see no reason for this court holding as a matter of law that the findings do not justify the conclusions.

The judgment should be affirmed, with costs.

CULLEN, Ch. J., WERNER, WILLARD BARTLETT, CUDDEBACK and HOGAN, JJ., concur; COLLIN, J., concurs in result.

Judgment affirmed.