LEON E. BORDEN, Respondent-Appellant, *v.* W. D. GUTHRIE et al., Defendants, and ROOSEVELT RACEWAY, INC., Respondent, and HARRY G. STARR et al., Appellants-Respondents.

First Department, June 17, 1965.

*Edmund H. H. Caddy* of counsel (*Caddy & Shepard,* attorneys), for Harry G. Starr, appellant-respondent.

*David W. Peck* of counsel (*Lester Kissel, Marvin Schwartz* and *Henry V. Kensing* with him on the brief; *Meyer, Kissel, Matz & Seward,* attorneys), for J. Alfred Valentine, appellant-respondent.

*Milton Paulson* for respondent-appellant.

*Samuel I. Rosenman* of counsel (*Max Freund, Stuart Robino-witz* and *Joseph Zuckerman* with him on the brief; *Rosenman Colin Kaye Petschek & Freund,* attorneys), for respondent.

McNALLY, J. In a stockholder's derivative action, defendants-appellants-respondents J. Alfred Valentine and Harry G. Starr have been cast in judgment, after a nonjury trial, for $371,495.45 and $215,652.83, respectively.

The issue presented is whether Valentine and Starr, officers, directors and the largest stockholders of defendant-respondent Roosevelt Raceway, Inc. (Roosevelt), violated any fiduciary duty in connection with the sale of their stock to Roosevelt.

The trial court held it was unfair for Valentine and Starr as fiduciaries, knowing that defendants George M. Levy and Alvin L. Weil, officers and directors of Roosevelt, feared the possibility that the shares might fall into undesirable hands, to demand and accept from Roosevelt a price more than its fair market value and that the excess thereof represented damage to Roosevelt. As to the directors other than Valentine and Starr, who voted to accept the tender of the stock, the court held that they acted in the highest good faith and definitely in the best interests of Roosevelt and its stockholders, and dismissed the complaint as against them.

We hold, in the circumstances, that as directors Valentine and Starr owed the paramount duty to deal fairly with Roosevelt, which was a *cestui que trust*; but this record shows no violation of any fiduciary duty. Accordingly, the judgment should be reversed and the complaint dismissed.

Roosevelt was organized in 1940. It owns and operates a harness raceway at Westbury, Long Island. In addition, Roosevelt owns considerable and valuable real property, improved and unimproved, in and about the raceway.

Levy, a member of the Bar for over 50 years, was the principal organizer of Roosevelt. In 1940 Levy owned 32% of the outstanding stock, the largest block. In 1962, 7,000,000 shares were outstanding. Levy and his family then owned the third largest block, exceeded only by the holdings of Valentine and Starr. In 1962, Valentine and Starr respectively owned 616,410 and 357,825 shares, whereas Levy and his family owned 340,000 shares. Since 1940 Levy has been Roosevelt's general counsel, chairman of the board of directors and chairman of the executive committee. Levy has been and is in charge of racing operations, real property and all policy matters.

In or about 1959 Valentine informed Levy of his desire to sell his stock in Roosevelt. Valentine was then about 65 years of age and desired to retire. Apart from his Roosevelt holdings he was a millionaire. Thereafter Levy considered two offers to purchase a controlling interest consisting of the holdings of Levy, Valentine and Starr; one of them assigned $4.50 to $4.75 and the other $6 per share to the Valentine-Starr block.

The proposal involving the $6 price for the Valentine-Starr block was opposed by Arthur Feigenbaum, a stockholder. He organized a group of stockholders to object to the sale and advocated that Roosevelt purchase the shares of any director desiring to sell. Thereafter two other offers to purchase a controlling interest were submitted to Levy, each involving a price of $6 per share for the Valentine-Starr block. Levy finally decided against any sale involving a controlling interest.

Levy's decision against the sale of a controlling interest was on policy grounds concurred in by all interested parties. All concerned were eminently satisfied with the conduct of Roosevelt's affairs under the guidance of Levy. The intrinsic value of the stock was considerably more than its market value; Roosevelt had a cash surplus of $5,000,000. A shift in the control of Roosevelt in the wrong direction presented the possibility of a raid on the treasury and the likelihood of an investigation by one or more regulatory public agencies.

The only two directors desiring to sell their stock were Valentine and Starr. Starr had been gradually liquidating his holdings at favorable market levels. Valentine was not disposed to sell, except as part of a controlling interest. In any case, Valentine was not inclined to sell without consulting Levy.

The holdings of Valentine and Starr did not constitute a controlling interest. Valentine's holdings, however, under the cumulative voting of the corporation, enabled the election of one of 10 directors. Nevertheless, Valentine and Starr did not constitute a control group. Their aggregate of stock holdings was less than 1,000,000 of 7,000,000 outstanding shares and they did not control the board of directors or the management. We are not called upon at this time to pass on the duty or obligation of a member of a control group in respect of the sale of his stock to the corporation at what might be a profit to him. If members of a control group were involved, then, to be sure, a higher duty would be indicated, but as the concurring opinion reasons, even the higher duty was not breached in this case.

If, however, the large holdings of Valentine and Starr came into the hands of persons unacceptable to the Harness Racing Commission as stockholders of Roosevelt, a stock appraisal

proceeding might be necessary to liquidate their holdings. In that event the intrinsic value of the stock would be a relevant consideration in the statutory appraisal proceeding.

It was also the sentiment of the board of directors of Roosevelt as well as its principal stockholders that a reduction in capital with consequent increased equity per share was desirable.

During and prior to early 1962, Levy and Valentine had many talks regarding his desire to liquidate his Roosevelt holdings. Valentine's purpose to sell was fixed but he was reluctant to do so without the concurrence of Levy. Levy was fully cognizant of all the implications of a sale of Valentine's stock. All of the relevant data was known to the interested parties.

Feigenbaum suggested to Weil, Roosevelt's president, that the corporation purchase the shares of Valentine and Starr. Weil conveyed this to Levy who negotiated thereafter with Valentine and Starr. At a special meeting of the board of directors held March 14, 1962, the corporation was authorized to purchase not in excess of 1,000,000 shares of its stock at not more than $5 per share.

A special meeting of the board of directors of Roosevelt was held on April 16, 1962, attended by all the directors. The board, Valentine and Starr abstaining, voted a resolution authorizing an invitation to stockholders to tender shares of the corporation at $4.875 per share. On April 16, 1962 the market price of the Roosevelt stock ranged between $4.375 and $5.25 per share. The directors, other than Valentine and Starr, agreed in writing not to tender their stock. Tender was required by May 8, 1962 and action thereon by the corporation was to be on or before May 15, 1962. Payment for blocks of stock less than 20,000 was to be in cash, and for larger blocks 29% in cash and the balance in two equal installments payable January 2, 1964 and January 2, 1965 with interest at 3%, and the right in the corporation to prepay with interest to such date, without penalty. The tender was limited to 1,000,000 shares and with no obligation to accept on the part of the corporation.

At the annual meeting of stockholders held April 17, 1962, the stockholders were fully informed of the tender authorized by the board of directors on April 16, 1962. The subsequent notice of tender to the stockholders apprised them of the intention of Valentine and Starr to tender their shares, 616,410 and 357,825, respectively, and of their intention to resign as officers and directors; also that the other directors had agreed not to tender their stock.

The substance of the resolution authorizing the tender had been discussed between Levy and Valentine and between Levy

and Starr. Valentine and Starr acted independently, each following his own dictates.

On May 14, 1962 the market price of the stock was $4%ths per share. Levy informed Valentine and Starr the corporation would not act on the tender at a price in excess of the market. In the light of Levy's stand, the terms of the tender were modified to provide for an additional period of six months to pay the price above cash, the rate of interest to remain the same.

The tender totaled 1,060,659 shares, of which 616,410 were Valentine's and 357,825 Starr's. Valentine and Starr voluntarily reduced their tenders to 578,030 and 335,546 shares, respectively, which, together with 86,424 shares tendered by other stockholders, brought the tender within the prescribed maximum of 1,000,000 shares.

The board of directors, at the meeting of May 14, 1962, deliberated on, voted and accepted the tenders, Valentine and Starr not being present or participating.

Plaintiff's expert was of the opinion that the fair and reasonable price of the stock on May 14, 1962 was $3 to $3.75 per share, net, on a cash basis, and between $3.20 and $3.95 on credit terms similar to those attending the exercise of the options of the corporation. This price assumed the sale of the stock of Valentine and Starr at a private sale to an investor willing to submit to the position of a minority stockholder with no access to the underlying assets of the corporation. Defendants-appellants' expert testified his opinion to be that the value per share on April 16, 1962 at a private placement was $4.50 per share, less a commission of $11.88 per 100 shares or $11.88 per share, or a net of $4.3812 per share. The trial court found the market value per share to be $4.275.

The market value at the time of the sale found by the trial court is in accord with the weight of the evidence, if it be assumed to apply to a private sale between a willing buyer and seller, other than the parties to the transaction here involved. This brings us to the critical issue: Is the corporation bound by the price at which the tenders were accepted on May 14, 1962 or, despite its acceptance, is it entitled to the fair market price?

Valentine and Starr were minority stockholders. Between them they owned about 15% of the outstanding shares of stock of Roosevelt. There is no evidence that Valentine and Starr together or separately dominated, controlled or substantially influenced the policies or management of the corporation. The evidence is clear, uncontradicted and conclusive that Levy managed, controlled and directed the corporation's operations and policies. The testimony of Levy and Weil, president of

Roosevelt, is that Weil, and not Valentine or Starr, first suggested acquisition of their stock by Roosevelt. There is no evidence that Valentine or Starr initiated the proposal.

The general rule is that a stockholder has a legal right to vote and dispose of his stock as his self-interest dictates. (*Gamble* v. *Queens County Water Co.,* 123 N. Y. 91, 97; *Blaustein* v. *Pan Amer. Petroleum & Transp. Co.,* 263 App. Div. 97, 119, affd. 293 N. Y. 281; *Kavanaugh* v. *Kavanaugh Knitting Co.,* 226 N. Y. 185, 194; *Levy* v. *American Beverage Corp.,* 265 App. Div. 208, 218; *Cleary* v. *Higley,* 154 Misc. 158, 168–169, affd. 246 App. Div. 698; *Stanton* v. *Schenck,* 140 Misc. 621, 628; *Benson* v. *Braun,* 8 Misc 2d 67.)

The motivations for the sale and purchase of the shares of stock of Valentine and Starr do not serve to establish or enlarge their legal obligation as shareholders. Granted they were desirous of selling and that a sale to undesirables was fraught with adverse possibilities to Roosevelt, it does not follow that the right of Valentine and Starr to dispose of their stock was thereby inhibited or restricted.

The tender price of the stock is not rendered suspect even if it does reflect the corporation's anxiety as to the consequences of its acquisition by undesirables. Valentine and Starr did not create the anxiety. Unless it be held that they had no right to sell their stock because the anxiety existed, it was within the proper scope of their self-interest for Valentine and Starr to recognize the demand for their holdings. (*Levy* v. *American Beverage Corp., supra,* p. 218.)

The decision of the trial court and the points of the respondents do not base the judgment herein on the breach of any fiduciary obligation of Valentine and Starr as stockholders.

On this record it does not appear that Valentine or Starr violated his fiduciary obligation as director of Roosevelt. On the contrary, it appears that the negotiations for and the acquisition of the stock by Roosevelt were not in the slightest affected by the circumstance that Valentine and Starr were directors.

Indispensable to liability for violation of his fiduciary obligation as to any personal transaction with the corporation is the demonstration that a director has acted in a dual capacity — for himself as well as the corporation. (*Everett* v. *Phillips,* 288 N. Y. 227, 236–237; *Munson* v. *Syracuse, Geneva & Corning R. R. Co.,* 103 N. Y. 58, 73–74; *Marian* v. *Mariani,* 276 App. Div. 205, 208; *New York Trust Co.* v. *American Realty Co.,* 244 N. Y. 209, 215; *Globe Woolen Co.* v. *Utica Gas & Elec. Co.,* 224 N. Y. 483, 489.)

Valentine and Starr did not acquire their stock holdings in Roosevelt with the purpose of exploiting the anxiety and fear incident to the sale thereof to undesirable persons. In that case it might be urged that the acquisition of the stock by Valentine and Starr was in violation of their duty as directors to act for the advantage of Roosevelt and not to its disadvantage. (Cf. *New York Trust Co.* v. *American Realty Co., supra*, p. 219.) The acquisition of the stock holdings of Valentine and Starr was not attended by any ulterior motive as to Roosevelt.

In the case of Valentine, the tender was prompted by his desire to retire and liquidate his holdings in Roosevelt. In the case of Starr, the evidence is that for some time prior to the tender he had been liquidating his stock holdings at market prices at times more favorable than the price at which he tendered his shares to Roosevelt. There is no evidence that Valentine's plan to retire or Starr's liquidation of his holdings were in any degree motivated by the purpose to create or exploit anxiety on the part of Levy, Roosevelt or its directors or stockholders, as to the possibility of an undesirable purchaser or purchasers. Special Term failed to find any improper motive in respect of the purpose to sell on the part of either Valentine or Starr and respondents do not so contend.

On this record the aspect most favorable to the respondents is that Valentine and Starr decided to liquidate at a time when Roosevelt and its directors and stockholders were, rightly or wrongly, concerned about the undesirability of their holdings, particularly Valentine's coming into the hands of an undesirable person. This fortuitous confluence of purpose and concern caused Roosevelt to tender more per share to Valentine and Starr than was obtainable at a private sale. If all this be assumed, no breach of any fiduciary obligation on the part of Valentine or Starr has been established.

Valentine and Starr were negotiating for disposition of their holdings to Roosevelt of which they were directors and officers. They were under the duty to full disclosure, and withdrawal from the board's deliberations on the matter was indicated, if not necessary. (*Billings* v. *Shaw*, 209 N. Y. 265, 280; *Dodge* v. *Richmond*, 10 A D 2d 4, 15–16.) The trial court did not find and it is not urged on this appeal that either Valentine or Starr misrepresented or failed to disclose any pertinent information. It is not contended nor does it appear that they acted for and in behalf of Roosevelt in the negotiations preceding the tender. Valentine and Starr were not present at the meeting and did not vote on the proposal of the directors authorizing the tender of the stock to Roosevelt. Moreover, its charter provides no

transaction of the corporation shall be invalidated by the fact that a director is interested in or a party thereto.

The omission to vote as directors would not have availed Valentine and Starr if they had failed to divulge pertinent information. (*Globe Woolen Co.* v. *Utica Gas & Elec. Co., supra*, p. 489.) Here, however, there is not a scintilla of evidence of omission or commission on the part of Valentine or Starr as to any pertinent matter.

Levy conducted the negotiations for and in behalf of Roosevelt and he did so skillfully, competently and on terms most advantageous to Roosevelt under the circumstances, assuming its acquisition of the stock was in large part induced by its desire to avoid its acquisition by an undesirable. The record abundantly supports the finding of the trial court " that the directors who voted to accept the tender of stock by defendants Valentine and Starr at $47⅞ did so in the highest good faith and definitely in the best interests of the corporation and its stockholders ". On the other hand, the record is devoid of evidence of the breach of any duty owing by Valentine and Starr as directors of Roosevelt.

The corporate determination was, as found by the trial court, " in the best interests of the corporation ". There was no loss or disadvantage to Roosevelt. In no view of the case was it possible for Roosevelt to acquire the stock for less than it paid. The sole basis for the award below is that an assumed private sale by Valentine and Starr would have yielded them less than the amount received from Roosevelt. There is no evidence that either would have willingly sold at the amount realizable at a private sale. In sum, there is a failure of proof of unfairness or undue advantage, vis-a-vis, the appellants Valentine and Starr and Roosevelt. (*Case* v. *New York Cent. R. R. Co.*, 15 N Y 2d 150, 157.)

The judgment should be reversed, on the law and on the facts, with costs and disbursements to defendants-appellants-respondents Valentine and Starr, and the amended complaint dismissed, with costs.

BREITEL, J. P. (concurring). I find it necessary to state my reasons separately in concurring in the result reached by the majority.

The case is one of first impression and the question involved is whether two members of a control group in a public corporation may sell their shares to the corporation at a price higher than would have been received by them if negotiated with outsiders. I conclude that, so long as there was complete disclosure,

opportunity for other shareholders to accept the same tenders, or to resist the transaction by litigation or at a stockholders' meeting, and so long as the price represented fair value to the corporation, the transaction was not vulnerable.

Realistically, Valentine and Starr were part of the control group, which therefore dealt with itself. Each of the members of the control group, including Valentine and Starr, were founders of the corporation and directors. While Levy was the dominant figure, this was because of the concurrence of the control group and not because he owned sufficient stock in his own right to exercise control. He was therefore the chosen instrument of the control group, but their instrument, nevertheless, rather than a controlling factor disassociated from and independent of particular "minority" members of the control group, as were Valentine and Starr. In consequence, Valentine and Starr owed the corporation, not only as stockholders and directors, but as part of the control group, total and primary loyalty and a duty to forbear from any profit at the expense of the corporation arising from their special relation to the corporation (see, generally, Hill, Sale of Controlling Shares, 70 Harv. L. Rev. 986 and Berle, "Control" in Corporate Law, 58 Col. L. Rev. 1212, in which the effect of the sale or purchase of significant amounts to minority stock are recognized as occasionally contributing to "control", with corresponding fiduciary duties).

Although the experts for both sides agreed that the sale of a noncontrolling block of 1,000,000 shares to outsiders is often accomplished only at a discount from the open market price, this in no way determines the value, or better, the fairness of the sale price, for the sale between the insiders and the corporation. The large block of shares would just not necessarily have the same value to outsiders, and the size of the block would upset the demand-supply balance of the market. The expert opinions, therefore, as to these hypothetical negotiated sales were relevant as factors to be considered in disclosing the range of values for the stock in question, but not determinative in fixing the fair price for this "inside" transaction. And, of course, as the majority opinion points out, Valentine and Starr owed no duty to sell to such outsiders.

For another reason the negotiations in this case involved special difficulties and the expert opinions are only suggestive and not conclusive. These were negotiations between buyers and sellers with special confluent reasons that the corporation, on the one hand, and that Valentine and Starr, on the other, had, for effecting a sale between them. That confluence of motiva-

tions is difficult to find or hypothesize in assumed but unreal transactions. Yet it is elementary economics that motivation is highly influential, if not controlling, in fixing market values.

The simple fact was that between the corporation and the sellers in this case there were uniquely matching reasons for effecting a sale between them and with no one else. It was, as the trial court found, in the best interests of the corporation to acquire the stock, if indeed it was not essential. At the same time, it was quite important for the sellers to sell, but not necessarily to the corporation and not necessarily over a market-upsetting short period. There was no motive to perpetuate control; the control group would remain in control independently of this acquisition. The sellers could, of course, do better economically, the law permitting, and with good conscience toward their fellow stockholders, if they sold to the corporation than if they put the stock out on the open market.

Under these circumstances, it would have been folly to ignore the opportunity and it would be folly for the law to apply reasons and bases for fixing fair value that do not apply to the actual situation. The only solution was a negotiated price, and if the negotiated price was fair, that is, within reasonable limits, the negotiation accompanied by complete disclosure with opportunity to other stockholders to join in the transactions or to resist it by showing unfairness, none should complain. And, of course, there is no one value or absolute price, only a matter of fair price.

The stock had a relatively high " intrinsic " value because of the high value of the corporation's assets, including real property. The market, however, did not reflect this higher value. Whatever the reason for this may be, the actual market price remains a better indicator of the price at which an intelligent stranger would sell to the corporation or buy from these defendants. For this reason market price is usually preferred to " intrinsic " value in most cases requiring a judicial determination of value (1 Bonbright, Valuation of Property [1937], pp. 24–28, esp. p. 28).

Tested by actual market values the price was fair to the corporation. On April 16, 1962 the closing price on the American Stock Exchange was $5.125 per share. Thereafter, on the same day and with knowledge of that price, the corporation's board of directors (Valentine and Starr not participating) authorized its officers to invite shareholders to tender sale of their shares for $4.875 per share, substantially below the market price. On May 14, 1962 the closing price on the American Stock Exchange was $4.625 per share. On that day and with knowledge of that

closing price the board again met (Valentine and Starr not present) and accepted the tenders at $4.875 per share made by various shareholders other than Starr and Valentine. The board also accepted an arrangement that had been negotiated with Starr and Valentine under which payment for their shares would be made over a period of time. Because of this credit given by Starr and Valentine, the trial court found that the effective price received by them for their shares was only $4.59 per share. Thus the price actually received by Starr and Valentine was $.035 per share less than actual market price on the date of acceptance, $.285 per share less than the price received by the other tendering shareholders (and thus less than what plaintiff might have received for his shares), and $.535 per share less than actual market value on the date the tender was authorized.

An excellent check on the negotiation of the price was the fact that the control group that was to remain with the corporation was strongly concerned in not diluting the equity of its shares in the corporation by paying a greater price than necessary for the Valentine-Starr shares. And there has been no suggestion that the ostensible deal was any different from the real deal.

On the other hand, plaintiff would have shown unfairness if he had proven that the corporation could have bought a million shares elsewhere at a lower price, or that it could have mopped-up the shares in suit at a price less than was in fact negotiated after they had been sold on the open market. This is quite different from showing, as plaintiff did, that the sellers could not have obtained the same price on the open market or by private negotiation with outsiders.

If, as the complaint asserts, the sales price to defendants reflected a transfer of control of the corporation, the normal expectation would be that the sales price would actually exceed the market price (e.g., *Perlman* v. *Feldmann*, 219 F. 2d 173). The fact that the sales price was less than market price is, therefore, an important fact in showing the essential fairness of the transaction.

On this view the corporation did very well indeed, and while the situation required the control group to deal with a part of itself, there was no unfairness, and because the situation was what it was there was no choice for it except to deal with a part of itself. This meant, of course, that the transaction would inevitably remain subject to judicial review — intensive judicial review — for fairness in procedure and in result, but it also meant that it was not prohibited and that the law would not

require the sellers to sell at a price that would remove all motivation to sell to the corporation rather than to outsiders. (See, e.g., *Bosworth* v. *Allen,* 168 N. Y. 157, 165–168, but, cf., *Levy* v. *American Beverage Corp.,* 265 App. Div. 208, 218–219; *Sage* v. *Culver,* 147 N. Y. 241, 247; *Gerdes* v. *Reynolds,* 28 N. Y. S. 2d 622, 650–652 [WALTER, J.]; cf. Restatement, Trusts 2d, § 170, incl. Comments.)

In short, while Valentine and Starr, as parts of the control group, owed all the obligations of a controlling majority to the corporation and its stockholders, those obligations were not breached. They were not breached because the interests of the corporation required the transaction and it was accomplished under conditions of disclosure and fairness consistent with the necessity of effecting the transaction.

Accordingly, I concur and vote to reverse the judgment in favor of plaintiff and to dismiss the amended complaint, on the law and on the facts.

VALENTE and STEVENS, JJ., concur with McNALLY, J.; BREITEL, J. P., concurs in opinion.

Judgment unanimously reversed, on the law and on the facts, with $50 costs to defendants-appellants-respondents, and judgment rendered in favor of defendants-appellants-respondents dismissing the amended complaint, with costs.