Gabrielli, J.
(dissenting). I respectfully dissent. Defendant executor appeals from an order of the Appellate Division which affirmed a judgment of Supreme Court, following a nonjury trial, which granted plaintiff specific performance of an option to purchase certain stock from the estate of his deceased father. The order appealed from should be reversed *311 since the underlying agreement is unenforceable in that it improperly sought to limit the powers of the board of directors to manage the corporation. Moreover, even were the agreement itself valid, the option was terminated in accord with its own provisions some time prior to decedent’s death.
The bone of contention in this case is control of Triggs Color Printing Corporation, a small firm founded by decedent in 1925. The firm appears to have prospered for some years and, with the passage of time, decedent’s three sons became involved in the business to varying degrees. As of 1963, the corporation had issued some 254 shares of voting stock. Of these, decedent personally owned 149 shares and the remainder were distributed equally between his three sons, with each son owning 35 shares. At that time, decedent apparently selected his son Ransford, the plaintiff in this action, as the one he deemed best suited to control the business following decedent’s death. To that end, decedent transferred 36 of his shares to plaintiff. Thus, out of the 254 voting shares, decedent owned 113 shares, plaintiff owned 71 shares, and each of the other two sons owned 35 shares.
Shortly thereafter, plaintiff and decedent entered into the written agreement at issue in this case. The two agreed to vote their shares together so as not only to elect both of them as directors, but also to elect decedent chairman of the board at a guaranteed annual salary, and to appoint plaintiff president of the corporation at a guaranteed annual salary. Additionally, the agreement contained the following provision: "It is the present contemplation of Frederick Triggs, Sr. to execute an agreement with the Corporation for the Corporation to repurchase his stock in the event of his death. In the event for any reason that such agreement has not been executed between the said Frederick Triggs, Sr. and the Corporation, then, in that event, the remaining Stockholder, to wit: Ransford D. Triggs, shall have the right and option to purchase the said stock of Frederick Triggs, Sr. for a period of sixty (60) days following the death of Frederick Triggs, Sr.”
A few months later, decedent did enter into a repurchase agreement with the corporation. One year later, in 1964, the repurchase agreement with the corporation was canceled by consent of both decedent and the corporation. During the next few years, plaintiff gradually assumed an ever greater role in corporate affairs, and decedent’s influence waned. Eventually the two had a falling out, and decedent appears to have begun *312 to regret his choice of plaintiff as his successor. The corporation experienced some financial difficulties under plaintiff’s management, and the salary paid to decedent was decreased, at first with his consent and later over his objections. Finally, in February, 1970, decedent executed a codicil to his will by which he bequeathed his 113 shares of voting stock to his other two sons, and declared the 1963 agreement with plaintiff to be null and void. In April, 1970, decedent died.
Following decedent’s death, plaintiff sought to exercise the option to purchase the 113 shares from the estate, but the estate refused to transfer the stock. Some four years later, in September, 1974, plaintiff commenced this action seeking to compel the estate to honor the option. Defendant executor submitted an answer in which he questioned the continuing validity of the option, alleged that even if the option were valid plaintiff was not entitled to specific performance since he had breached that part of the agreement calling for payment of a guaranteed salary to decedent, and counterclaimed for the amount of unpaid salary should the court find that the agreement was valid. Following service of an answer, but some time prior to trial, defendant moved to dismiss the complaint for failure to state a cause of action, alleging for the first time that the agreement was illegal. The court denied that motion on the merits at the beginning of the trial, declaring that the agreement "did not in any way sufficiently stultify the Board of Directors in the operation of this business as to be [illegal]”.
At the conclusion of trial, the court ruled in favor of the plaintiff to the extent of granting him specific performance of the option and ordering the estate to transfer the stock to him upon tender of payment. As to the counterclaim, the court held in favor of defendant, awarding the estate judgment for the amount of unpaid salary owed to decedent. Defendant executor alone appealed, and the Appellate Division affirmed on the opinion by Mr. Justice Nusbaum at Supreme Court. Two Justices dissented, stating that the option had been extinguished by its own terms when decedent entered into the repurchase agreement with the corporation. Defendant now appeals to this court as of right, pursuant to CPLR 5601 (subd [a], par [i]). There should be a reversal.
It has long been the law in this State that a corporation must be managed by the board of directors (Business Corporation Law, § 701) who serve as trustees for the benefit of the *313 corporation and all its shareholders (see, e.g., Billings v Shaw, 209 NY 265). To prevent control of the corporation from being diverted into the hands of individuals or groups who in some cases might not be subject to quite the same fiduciary obligations as are imposed upon directors as a matter of course, the courts have always looked unfavorably towards attempts to circumvent the discretionary authority given the board of directors by law (Manson v Curtis, 223 NY 313; McQuade v Stoneham, 263 NY 323; Long Park, Inc. v Trenton-New Brunswick Theatres Co., 297 NY 174; see, also, Matter of Hirshon, 13 NY2d 787; cf. Matter of Glekel [Gluck], 30 NY2d 93). Such mátters normally arise in the context of an agreement between shareholders to utilize their shares so as to force the board of directors to take certain actions. Unless in accord with some statutorily approved mechanism for shifting power from the board of directors to other parties (e.g., Business Corporation Law, § 620, subd [b]), such agreements have been found valid only where the proponent of the agreement can prove that the violation of the statutory mandate is minimal and, more importantly, that there is no danger of harm either to the general public or to other shareholders (see Clark v Dodge, 269 NY 410).
It is, of course, proper for shareholders to combine in order to elect directors whom they believe will manage the corporation in accord with what those shareholders perceive to be the best interests of the corporation. Thus, an agreement between two shareholders to vote for a particular director or directors is not illegal and may be enforceable in an appropriate case (see Manson v Curtis, supra, pp 319-320; Business Corporation Law, § 620, subd [a]). If some shareholders seek to go beyond this, however, if they agree to vote their shares so as to impose their decisions upon the board of directors, such an agreement will normally be unenforceable. The agreement sought to be enforced in this case is just such an agreement.
In essence, the agreement between decedent and plaintiff consisted of three fundamental provisions: first, decedent promised to vote his shares so as to ensure the election of plaintiff as a director and his appointment as president for a 10-year period at a given salary; second, plaintiff promised to vote his shares so as to ensure the continuation of decedent as chairman of the board at a given salary for at least 10 years; and, third, decedent gave plaintiff a conditional option to purchase decedent’s voting shares after his death. It is beyond *314 dispute that the promises to secure the appointment of each party at a specific position other than director at a guaranteed annual salary are illegal. Plaintiff contends that the agreement is nonetheless enforceable by analogy to our decision in Clark v Dodge (269 NY 410, supra), in which we sustained an agreement between two shareholders who together owned all of the shares in the corporation. This argument is based on a fundamental misinterpretation of the significance of our decision in that case. Rather than illustrating any divergence from the great body of other cases which have found such agreements to be illegal and unenforceable, the Clark decision reflects a reasoned and flexible application of the principles which are in fact common to all such cases.
The dispositive consideration must always be the possibility of harm to either the other shareholders or to the general public either prospectively at the time the agreement was entered into or at the time it is sought to be enforced. In those cases in which the agreement is made by less than all the shareholders, almost any attempt to reduce the authority granted to the board by law will create a significant potential for harm to other shareholders even if the potential for harm to the general public is minimal. This is so because the effect of such an agreement is to deprive the other shareholders of the benefits and protections which the law perceives to exist when the corporation is managed by an independent board of directors, free to use its own business judgment in the best interest of the corporation.
In Clark, the possibility of harm to other shareholders was nonexistent, for in fact there were no other shareholders. In the instant case, in contradistinction, there were and are two other shareholders, not privy to the agreement between plaintiff and decedent. Moreover, the instant agreement for the continuation of plaintiff and decedent in their respective positions is in no way dependent on their performances in those positions, whereas the agreement in Clark provided that Clark was to be continued as manager "so long as he proved faithful, efficient and competent” (Clark v Dodge, 269 NY 410, 417, supra).
It has been suggested that even if the agreement is indeed illegal on its face, the defendant, in order to successfully assert the defense of illegality, must prove that the other shareholders did not know of and acquiesce in the agreement. This contention is illogical, and is at any rate inapplicable to *315 the instant case. In this as in all actions the burden of proof is in the first instance always on the plaintiff who must prove his cause of action. Here, plaintiff seeks to meet that burden by proffering the contract itself as the basis for his claim. As is discussed above, however, that contract is illegal on its face and is thus unenforceable. If it is contended there exist circumstances which might prove that an agreement illegal on its face is in fact legal, the burden of proof as to these extrinsic facts must be placed upon the party who asserts the validity of the facially illegal agreement. In the instant case, plaintiff has neither alleged nor introduced any evidence to indicate that the other shareholders either knew of or ratified the agreement between plaintiff and decedent. Indeed, what little evidence does exist on this question would indicate to the contrary. David Triggs, the executor of decedent’s estate and himself a shareholder, testified that he first learned of the agreement around the time of his father’s death. Plaintiff himself testified that he did not know whether David Triggs was aware of the agreement prior to their father’s death. Finally, another director of the corporation, one Bannon, testified that he first became aware of the agreement after decedent’s death. In short, even were the burden with respect to this issue to be improperly placed upon defendant, that burden has been met.
It has also been suggested that the option should be severed from the other provisions of the agreement and separately enforced since it alone would not be illegal. The flaw in this argument is that it improperly assumes that decedent woulcl have given plaintiff this option by itself, without the other parts of their agreement. This assumption is one in which we may not indulge. Indeed, it appears that the illegal parts of the agreement were an intrinsic part of the covenant between these parties. While decedent apparently did wish to allow plaintiff to purchase the stock after his death if certain other possibilities did not eventuate, it is quite clear that decedent also wanted to protect his own position within the corporation from any challenge by plaintiff. Thus, the agreement was comprised of several component factors, and was motivated by complex and potentially conflicting objectives. The parties were concerned not only with control of the corporation following decedent’s demise, but also with the corporate power structure during the remainder of decedent’s life. To conclude that the option alone would have been entered into by the *316 parties would be to engage in untoward speculation. As we have held in another case where a similar argument was made, "[t]he contract was single and indivisible and the illegal part cannot be expunged” (Manson v Curtis, 223 NY 313, 324, supra).
In sum, law and logic both compel the conclusion that the option which plaintiff seeks to enforce was an inseverable part of a basically illegal agreement. As such, it may not be enforced.*
Even were the agreement a legally enforceable one, however, the order appealed from should still be reversed, for the option was in fact extinguished in accord with its own terms. The option was to become effective only "[i]n the event for any reason that [a repurchase agreement with the corporation] has not been executed” at the time of decedent’s death. Such an agreement was executed, however, several months after the agreement between plaintiff and decedent was entered into. Thus, the option, the very existence of which was conditioned upon the nonoccurrence of the specified event, never came into existence for the simple and indisputable reason that the specified event did occur.
The courts below avoided this result by concluding that the option was so ambiguous as to permit consideration of extrinsic evidence concerning the parties’ intent. The perceived ambiguity was that the option did not specify the result if the repurchase agreement with the corporation were to be first entered into and later canceled, as did happen. The problem with this analysis is that it equates silence with ambiguity. The option was phrased in clear and lucid language; it provided plaintiff with an option if and only if decedent failed to enter into a repurchase agreement with the corporation. Once that repurchase agreement was entered into, the option became a nullity, and decedent was free to do whatever he wished with his shares, subject to the contract with the *317 corporation. When that contract was canceled, even that limitation was removed. There is no basis, however, for concluding that the cancellation of the repurchase agreement revived the option. The option was conditioned not on the lack of an enforceable repurchase agreement at the time of decedent’s death, but rather on the nonexecution of such an agreement. Had the parties wished to agree otherwise, they were free to do so. They did not do so, and the courts may not now rewrite the contract.
Accordingly, I vote to reverse the order appealed from and to dismiss the complaint.

 It should also be noted, that plaintiff did not fulfill his obligations under the agreement with decedent. That agreement required that decedent be paid a certain minimum salary for at least the first 10 years following the making of the agreement. By deciding the counterclaim in favor of defendant, the trial court necessarily concluded that plaintiff had not performed his part of the bargain. That conclusion is of course binding on plaintiff in the context of this appeal. Since plaintiff did not perform, decedent was justified in repudiating the agreement, which he did by means of the codicil to his will. Accordingly, plaintiff is not entitled to enforce the agreement.